# IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | |
|---|---|
| JOHN DOE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| DAVID RAUSCH, Director of Tennessee | )    JURY DEMAND |
| Bureau of Investigation, *in his official capacity,* | ) |
| | ) |
| Defendant. | ) |

---

## COMPLAINT FOR INJUNCTIVE RELIEF

---

COMES NOW Plaintiff John Doe, by and through undersigned counsel, and hereby respectfully submits the following Complaint against Defendant Rausch in his official capacity:

### I.    INTRODUCTION

*"The names of persons who have committed [kidnapping and false imprisonment] crimes without a sexual or violent element and who do not pose a serious, immediate, or specific threat to children are being grouped with the names of some of the most dangerous and vicious sex offenders. This is one of the main points raised by those members of Congress who voted against the [Adam Walsh Act's] enactment. Additionally, child protective resources in the form of law enforcement manpower, monetary funds, and public awareness are being misdirected and misappropriated because they are wasted on offenders who are not a grave danger to minors."*

> Steven Costigliacci, Esq., "Protecting Our Children From Sex Offenders: Have We Gone Too Far?", 46 Fam. Ct. Rev. 180 (2008).

*"The registration and reporting duties imposed on convicted sex offenders are comparable to the duties imposed on other convicted criminals during periods of supervised release or parole. And there can be no doubt that the 'widespread public access,' [...] to this personal and constantly updated information has a severe stigmatizing effect. In my judgment, these statutes unquestionably affect a constitutionally protected interest in liberty."*

> *Smith v. Doe*, 538 U.S. 84, 112 (2003 (Stevens, J., concurring)

1.      Mr. Doe has been classified, registered, and held out to the public by Defendant Rausch as a "Violent Sexual Offender" despite never having been convicted of any sexual misconduct and despite his purportedly registrable offense not involving even the *allegation* of sexual misconduct.

2.      Defendant Rausch publicly claims that Mr. Doe's classification and forced registration as a "Violent Sexual Offender" is based on a conviction for "Aggravated Kidnapping" despite Mr. Doe having never been convicted of aggravated kidnapping.

3.      Under Tennessee's Sex Offender Registry laws, a conviction for Kidnapping where the victim is a minor constitutes a "Sexual Offense" requiring registration for ten years not a "Violent Sexual Offense" requiring lifetime registration.

4.      Defendant Rausch further publicly claims that Mr. Doe's classification and forced registration as a "Violent Sexual Offender" is based on Mr. Doe's kidnapping victim's status as a minor and not being Mr. Doe's child – which is material information under the Tennessee Sex Offender Registry laws – despite that information not appearing in Mr. Doe's judgment.  Without unilaterally substantiating this material information, Defendant Rausch could not classify or force Mr. Doe to register as either sexual offender or violent sexual offender since both designations require the victim to be a minor and not the child of the offender.

5.      At no point did Defendant Raush provide Mr. Doe with procedurally adequate safeguards, including, but not limited to, notice and a hearing.

6.      As recently held by District Court Judge Aleta Trauger in a similar case, "The Tennessee sexual offender registry is designed for actual sexual offenders; individuals rely on it to learn about actual sexual offenders; law enforcement uses it to know which individuals to treat like actual sexual offenders; and Doe is not an actual sexual offenders [...] While it is true that

some individuals who have been convicted only for kidnapping were actually acting with a sexual motivation, a registry can encompass those individuals without extending its reach to every individual who kidnapped a child other than a parent." *Jane Doe v. Lee, et al*, 3:23-cv-00965, 752 F. Supp.3d 884 (M.D. Tenn. Sep. 30, 2024).

7.      Finally, Defendant Rausch's classification and forced registration of Mr. Doe does not afford Mr. Doe equal protection under the law because similar individuals in every other relevant respect – those convicted of kidnapping in Tennessee – are irrationally not required to register as sex offenders or violent sex offenders if they are a parent of the kidnapped victim.

8.      Despite these violations of Mr. Doe's substantive due process, procedural due process, and equal protection rights, Defendant Rausch is publicly classifying and forcing Mr. Doe to register as a violent sex offender which is highly stigmatizing and negatively impactful to Mr. Doe in essentially every aspect of his life.

## II.      PARTIES

9.      Plaintiff John Doe is an individual who resides in Tennessee and can be served through undersigned counsel.

10.      Defendant David Rausch is the Director of the Tennessee Bureau of Investigation ("TBI"). He is sued in his official capacity. Under the Act, TBI is charged with maintaining the state's sex offender registry ("SOR"). *See* Tenn. Code Ann. § 40-39-204(a) &(d); Tenn. Code Ann. §40-39-206(a); Tenn. Code Ann. § 40-39-202(22). TBI is also tasked with enforcing many of the Act's key provisions, including maintaining and publishing a centralized record system, *see* Tenn. Code Ann. § 40-39-204(a); designing, printing, and distributing registration forms, *see* Tenn. Code Ann. § 40-39-205(a); keeping offenders informed of the registration, verification, tracking requirement, and sanctions under the Act, *see* Tenn. Code Ann. §40-39-205(f); notifying

law enforcement when an offender is not in compliance with the Act, *see* Tenn. Code Ann. § 40-39-206(b); determining whether offenses committed in a jurisdiction outside Tennessee require a person to register, *see* Tenn. Code Ann. §40-39-202(1); determining whether a registrant is a "sexual offender" or "violent sexual offender" and therefore the length of their registry requirement, see Tenn. Code Ann. §40-39-202(19),(20) (30); and, processing eligible offender requests to be removed from the registry, *see* Tenn. Code. Ann. §40-39-207(a)(1).

## II.     JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 due to federal questions of law presented under 42 U.S.C. § 1983 in all claims in Count One through Count Eight.

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

## III.     FACTS

### *Sex Offender Registry History*

13.     Florida State Law Professor Wayne Logan aptly summarized the hysteria which pushed the nationwide sex offender registry legislative wave, writing:

> Triggered in significant part by the October, 1989, abduction of eleven-year-old Jacob Wetterling in rural St. Joseph, Minnesota, Americans during the 1990s were beset by a "moral panic" over convicted sex offenders living in their midst. To be sure, this panic in itself was not unprecedented in American history. At regular intervals throughout the twentieth century, heinous sexual victimizations, of women and children in particular, preoccupied the nation, often after receiving intense media attention. The 1990s panic, however, was unique in its force and scope, taking tangible form in what has been aptly called a "legislative panic." As a result of converging social and political forces, including the increasingly influential victims' rights, child welfare, and women's movements, augmented by media attention of unprecedented influence, legislatures nationwide fixated on "sexual predators."

*See* Wayne Logan, "Examining Our Approaches to Sex Offenders & The Law: Jacob's Legacy: Sex Offender Registration and Community Notification Laws, Practice, and Procedure in Minnesota", 28 Wm. Mitchell L. Rev. 1287, 1287 (2003).

14.     Between 1990 and 1994, 38 states passed sex offender registration laws.  *See* Costigliacci, "Protecting Our Children from Sex Offenders: Have We Gone Too Far?", 46 Fam. Ct. Rev. 180, 182 (2008).

15.     In September 1994, the federal government joined the movement and passed the Jacob Wetterling Act.  Like many state and federal sex offender laws, the Jacob Wetterling Act was named to memorialize a victimed child named Jacob Wetterling who was eleven years old in 1989 when he was kidnapped at gunpoint in front of Wetterling's younger brother and another boy in Minnesota.  Wetterling was never seen again.[1]  Thus, a tragic but rare event shaped the irrational law that now – over 30 years later – requires Mr. Doe to register as a sex offender despite never even having been *suspected* of sexual misconduct in his so-called qualifying offense.

16.     The Wetterling Act "required all 50 states to create sex offender registries [...] [and] include certain enumerated sex offenses and the crimes of kidnapping and false imprisonment committed against a minor by a person who was not the minor's parent or guardian [...] or face a severe reduction in federal funding."  Costigliacci, "Protecting Our Children from Sex Offenders: Have We Gone Too Far?", 46 Fam. Ct. Rev. 180, 183 (2008).

17.     The Wetterling Act was amended several times by Megan's Law, the Pam Lyncher Sex Offender Tracking and Identification Act of 1996 ("Lyncher Act"), and Jennifer's

---

[1] Wetterling's killer, Danny Heinrich, confessed to abducting and killing Wetterling in 2015 as part of an unrelated plea deal for federal child pornography charges.

Law.  Each of these laws received its namesake to memorialize victimized women like the Wetterling Act.[2]

18.     The stated purpose of the Wetterling Act was described by its sponsor, Minnesota Senator David Durenberger, pertinently, as follows:

> I rise today to introduce the Crime Against Children Registration Act.  This legislation will require people who are convicted of a sexual offense against a child to register a current address with local law enforcement officials for 10 years after their release from prison.
>
> Mr. President, more than a year and a half ago, I became especially concerned about the vulnerability of America's children because of a tragic event that took place in my home community of St. Joseph,  MN.  On October 22, 1989, an 11-year-old boy named Jacob Wetterling was abducted by a masked man at gunpoint while returning home from a convenience store with his brother and a friend.  Not a single word has been heard from Jacob or his abductor since that day.
>
> [...]
>
> Local, State, and Federal Law enforcement officials responded quickly to Jacob's abduction.  If local and State police had been aware of the presence of any convicted sex offenders in the community, it would have been of invaluable assistance during those first critical hours of investigation.[3]  The Crimes Against Children Registration Act would provide law enforcement officials with this tool.
>
> [...]
>
> The reasons for enacting this legislation on the national level are clear: sexual crimes against children are widespread; the people who commit these offenses repeat their crimes again and again; and local law enforcement officials need access to an interstate system of information to prevent and respond to these horrible crimes against children.

[2] The bill was first introduced in May 1991 as the "Crimes Against Children Registration Act". Notably, the law failed to pass for three years until it was renamed the Jacob Wetterling Act.  By then, the bill had to be reintroduced in the House because its Senate sponsor, Durenberger, had been federally indicted for misuse of public funds to which he later pleaded guilty.

[3] Heinrich, Wetterling's later-confessed abductor, does not appear to have been a convicted sex offender prior to abducting Wetterling such that he would have been on any registry.

If there is any doubt about the seriousness of the problem, consider the following statistics, provided to me by the National Center for Missing and Exploited Children:

ChildHelp USA estimates that 1 in 3 girls and 1 in 6 boys will be sexually abused or victimized before the age of 18. More than half – 54 percent – of sexually abused children are victimized before age 7, and 84 percent are younger than 12 years old. Of the 2.4 million reported cases of child abuse in 1989, 380,000 involved sexual abuse. ***Two-thirds of reported nonfamily child abductions involved sexual assault*.**[4] According to the FBI Law Enforcement Bulletin, child molestation is one of the most underreported crimes – only one to 10 percent of these crimes are ever disclosed.

[...]

Mr. President, the Crimes Against Children Registration Act may require some of us to choose between two interests. One of those interest is the interest in protecting children from sexual abuse and exploitation. The other interest is in the inconvenience to convicted child sex offenders who would be required to register an address with law enforcement officials once a year and each time they move.

Mr. President, for this Senator, there are no competing issues to debate. If a registration requirement for convicted sex offenders will assist law enforcement authorities in one criminal apprehension, or if it will deter a single kidnapping, I believe it is worth implementing.

(*See* Exhibit 1: 5-23-91 Congressional Record Excerpt) (emphasis added).

---

[4] This claim will be further addressed in Paragraphs 56 through 69.

19.     After several years of unsuccessful attempts, the Wetterling Act finally passed in September 1994 less than two months after the highly publicized abduction of Megan Kanka in July 1994, which was specifically used as fuel to pass the bill.  *See* Wayne A. Logan, *Criminal Justice Federalism and National Sex Offender Policy*, 6 Ohio St. J. Crim. L. 51 (2008) (available at: https://ir.law.fsu.edu/cgi/viewcontent.cgi?article=1177&context=articles) (last accessed: July 23, 2025).[5]

20.     It is irrational to presume that Megan Kanka's parents would have considered preventing their 7-year-old daughter from accompanying their 33-year-old male neighbor into his home alone *only* if they knew the man was a convicted sex offender.

21.     No lawmaker or other stakeholder has ever sufficiently explained, in detail, exactly how the current (or any) public-facing sex offender registry with all its requirements and restrictions would have prevented Jacob Wetterling from disappearing; or would have prevented Megan Kanka's neighbor from raping and murdering her ("Megan's Law"); or would have prevented a handyman from attacking Pam Lyncher at her home in front of her husband ("Pam Lyncher Act"); or Jennifer Magnano's estranged husband from fatally shooting her; or have prevented Jennifer Dulos from being allegedly killed by her husband ("Jennifers' Law").  Nor has any lawmaker or other stakeholder ever explained, in detail, exactly how any sex offender registry law would protect the public from similar offenses by any of these perpetrators in the future.

22.     The registries called for by the Wetterling Act were not required to be public facing until Megan's Law was passed in 1996.

---

[5] Professor Logan's article offers an extremely thorough account of the historical, cultural and political backdrop of sex offender registry laws at the state and, particularly, the federal level.

23.     No governmental and non-governmental organization operating in the criminal justice and policy arena with any degree of focus on sex offender policy has produced any data or report demonstrating that sex offender registry laws effectuate the stated legislative purpose.

24.     Every instance of a first time sex offender disproves the purported deterrent effect of the sex offender registry laws.  Similarly, every case of recidivism further proves that the sex offender registry laws do not protect the public from further offenses by registered offenders. This leaves only one potential source of proof that the sex offender registry laws are rationally connected to their legislative purpose:  sex offenders that do not reoffend and people who are capable of committing sex offenses but never do.  There is no way for sex offender registry law proponents like Defendant Rausch to prove that these non-occurring sex offenses – either by recidivating offenders or would-be first-time offenders –  did *not* occur *because* of the sex offender registry laws independent of any deterrent effect of arrest and sentencing.  And, if there were a way to prove this causal connection, it has never been remotely demonstrated by any proponent of sex offender registry laws.

25.     Ironically, Jacob Wetterling's mother, Patty Wetterling – who initially championed passage of the nation's first federal law in her son's name requiring states to create registries including kidnapping as a registrable offense – has since "turned 180 [degrees] from where [she] was." [6]  In a 2016 interview with American Public Media, while she was still a board member for the International Centre for Missing & Exploited Children, Wetterling stated:

> What we really want is no more victims.  Don't do it again.  So, how can we get there?  Locking them up forever, labeling them, and not allowing them community support doesn't work.

---

[6] Baran, M. and Vogel, J., "Sex-offender registries How the Wetterling abduction changed the country", American Public Media Reports - In the Dark (available at: https://www.apmreports.org/story/2016/10/04/sex-offender-registries-wetterling-abduction) (last accessed: July 3, 2025).

26.     Aside from the inefficacy of sex offender registries broadly, the case for a rational basis supporting the inclusion of Mr. Doe and others convicted of kidnapping regardless of whether there was a sexual motivation is even more non-existent.

27.     Forcing Mr. Doe, who is not a sex offender, to publicly register as a sex offender not only does not serve the purported legislative interest of protecting the public from sex offenders but it actively *disserves* that interest by misleading the public and diverting public resources to monitor him which would otherwise be used to monitor actual sex offenders.  Even if monitoring sex offenders has no actual, demonstrable efficacy towards the law's stated purpose, both the Constitution and rational public policy require resources for monitoring sex offenders to be, at the very least, used for monitoring *actual* sex offenders.

28.     The federal sex offender laws were replaced in 2006 with the Adam Walsh Act – another piece of legislation memorializing a victim, this time a six-year-old boy named Adam Walsh who was abducted and killed by Ottis Toole in 1981.[7]  The Adam Walsh Act – also known as the Sex Offender Registration and Notification Act ("SORNA") – remains in effect today.

29.     SORNA unified the registration framework from the Wetterling Act, the public notification requirements of Megan's Law, the national database of Jennifer's Law, the expansion of reporting and tracking requirements of the Lyncher Act, and other previous amendments, while also introducing a tiered offender classification, retroactive application, and other gap-filling measures.

---

[7] Like the other victims with legislation bearing their names, the Adam Walsh Act would have done absolutely nothing to protect Adam Walsh or prevent his abduction.

30. Tellingly, SORNA expressly provides states with a loophole to achieve compliance and not lose its funding if the state's high court rules any provision unconstitutional:

(b) State constitutionality.

(1) In general. When evaluating whether a jurisdiction has substantially implemented this title, the Attorney General shall consider whether the jurisdiction is unable to substantially implement this title because of a demonstrated inability to implement certain provisions that would place the jurisdiction in violation of its constitution, as determined by a ruling of the jurisdiction's highest court.

(2) Efforts. If the circumstances arise under paragraph (1), then the Attorney General and the jurisdiction shall make good faith efforts to accomplish substantial implementation of this title and to reconcile any conflicts between this title and the jurisdiction's constitution. In considering whether compliance with the requirements of this title would likely violate the jurisdiction's constitution or an interpretation thereof by the jurisdiction's highest court, the Attorney General shall consult with the chief executive and chief legal officer of the jurisdiction concerning the jurisdiction's interpretation of the jurisdiction's constitution and rulings thereon by the jurisdiction's highest court.

(3) Alternative procedures. If the jurisdiction is unable to substantially implement this title because of a limitation imposed by the jurisdiction's constitution, the Attorney General may determine that the jurisdiction is in compliance with this Act if the jurisdiction has made, or is in the process of implementing [,] reasonable alternative procedures or accommodations, which are consistent with the purposes of this Act.

(4) Funding reduction. If a jurisdiction does not comply with paragraph (3), then the jurisdiction shall be subject to a funding reduction as specified in subsection (a).

34 U.S.C. § 20927(b)(1)-(4).

### *Tennessee's Registry Law*

31. "Tennessee's first sex offender registration law, known as the Sexual Offender Registration and Monitoring Act ("SORMA") [signed into law on May 10, 1994 and] became effective January 1, 1995." *Doe v. Lee,* 102 F.4th 330, 332-333 (6th Cir. 2024).

32.     SORMA was amended at least five times between 1994 and 2003 to impose additional restrictions and requirements and to expand the class of offenders to whom it applied.

33.     In 2004, "[Tennessee's] General Assembly repealed SORMA and replaced it with the Tennessee Sexual Offender and Violent Sexual Offender Registration, Verification, and Tracking Act ["SORA"].  SORA continues in force today.  SORA largely continued the same classification system but also divided registrants into two classes – sexual offenders or violent sexual offenders – based on their offense of conviction."  *Lee*, 102 F.4th at 333.

34.     "[SORA's] major requirements can be classified in five categories: 1. *Providing and updating information.* [...] 2. *Periodic in-person reporting.* [...] 3. *Residence and work restrictions.* [...] 4. *Movement restrictions.* [...] 5. *Additional restrictions related to children*[.]" *Doe. v. Lee*, 609 F.Supp. 3d 578, 587-589 (M.D. Tenn. Jun. 16, 2022).

35.     Since its passing in 2004, SORA has been amended every year except 2013.

36.     The General Assembly's original, express articulation of the general legislative interest and purpose for SORA stated:

(a) This part shall be known and may be cited as the "Tennessee Sexual Offender and Violent Sexual Offender Registration, Verification, and Tracking Act of 2004."

(b) The general assembly finds and declares that:

(1) Repeat sexual offenders, sexual offenders who use physical violence, and sexual offenders who prey on children are violent sexual offenders who present an extreme threat to the public safety. Sexual offenders pose a high risk of engaging in further offenses after release from incarceration or commitment, and protection of the public from these offenders is of paramount public interest;

**(2) It is a compelling and necessary public interest that the public have information concerning persons convicted of sexual offenses collected pursuant to this part to allow members of the public to adequately protect themselves and their children from these persons**;

(3) Persons convicted of these sexual offenses have a reduced expectation of privacy because of the public's interest in public safety;

(4) In balancing the sexual offender's and violent sexual offender's due process and other rights against the interests of public security, the general assembly finds that releasing information about offenders under the circumstances specified in this part will further the primary governmental interest of protecting vulnerable populations from potential harm;

(5) The registration of offenders, utilizing complete and accurate information, along with the public release of specified information concerning offenders, will further the governmental interests of public safety and public scrutiny of the criminal and mental health systems which deal with these offenders;

(6) **To protect the safety and general welfare of the people of this state, it is necessary to provide for continued registration of offenders and for the public release of specified information regarding offenders.** This policy of authorizing the release of necessary and relevant information about offenders to members of the general public is a means of assuring public protection and shall not be construed as punitive;

(7) The offender is subject to specified terms and conditions which are implemented at sentencing, or, at the time of release from incarceration, which require that those who are financially able must pay specified administrative costs to the appropriate registering agency, who shall retain these costs, for the administration of this part and shall be reserved for the purposes authorized by this part at the end of each fiscal year; and

(8) The general assembly also declares, however, that in making information about certain offenders available to the public, it does not intend that the information be used to inflict retribution or additional punishment on any such offenders.

This Acts 2004, ch. 921, § 1; 2003 H.B (emphasis added).[8]

---

[8] This original statement of legislative interest and purpose is identical to the current version except for subsection (7) which now states:

The offender is subject to specified terms and conditions that are implemented at sentencing or, at the time of release from incarceration, that require that those who are financially able must pay specified administrative costs to the appropriate registering agency, which shall retain one hundred dollars ($100) of the costs for the administration of this part and the investigation of sexual offenses, including the purchase of specialized equipment for use in the investigation of sexual offenses, and must be reserved for such purposes at the end of each fiscal year,

37.     Tennessee's registrable offenses have not always mirrored federal law regarding the inclusion of kidnapping and false imprisonment as registrable offenses where the victim is a minor and the offender is not the parent of the victim.  SORMA did not include either as a registrable offense.  While SORMA was technically passed three months before the Wetterling Act, none of SORMA's amendments post-Wetterling Act added kidnapping or false imprisonment to comport with federal law.

38.     It was not until the replacement of SORMA with the passage of SORA in 2004 that Tennessee added kidnapping and false imprisonment to the list of registrable offenses.

39.     According to its archived legislative history, SORA was discussed on record on nine occasions by various constituencies of the General Assembly during its consideration and passing from February 23, 2004 to May 21, 2004.  During none of these discussions did any legislator specifically address the new inclusion of kidnapping or false imprisonment among registrable offenses.  The closest any legislator got to such a statement was House Majority Leader Kim McMillan's statement that the work that went into SORA was, in part, intended to make Tennessee "compliant with federal law."

40.     Several legislators did, however, repeatedly and expressly discuss "a lot of publicity" in the preceding summer of 2003 regarding claims that sex offenders were moving to Tennessee from other states under the perception that Tennessee's sex offender registration laws were "lax."  Tennessee was referred to by different legislators as a "haven" and "dumping

---

with the remaining fifty dollars ($50.00) of fees to be remitted to the state treasury to be deposited into the general fund of the state; provided, that a juvenile offender required to register under this part shall not be required to pay the administrative fee until the offender reaches eighteen (18) years of age[.]

Tenn. Code Ann. § 40-39-201(7).

ground" for sex offenders. The official response to these stories in the (unspecified) press was to create a working group to study the state of compliance amongst sex offenders in Tennessee and survey other states for ways to strengthen Tennessee's laws According to the working group's spokesperson, John Carney, Jr. Carney represented the group during SORA's legislative sessions.

41. Leader McMillan was SORA's sponsor in Tennessee's House of Representatives. She stated to the House Judiciary Committee on March 31, 2004, "[SORA] will definitely put us in a class where our law will be as tough as possible." She further stated, "We feel that this law, if passed, would be one of the strongest in the nation."

42. During the full House session on May 12, 2004, Leader McMillan stated to legislators that SORA "tells [sex offenders] that Tennessee is not a friendly place to come."

43. It is revealing that what led to SORA was not a surge in the occurrence of sex offenses in Tennessee, but rather a perception that sex offenders considered Tennessee as a more favorable place to live in comparison to other states with respect to sex offender registry laws.

44. Even granting a legitimate purpose, the premise that non-compliant sex offenders would be of less risk to the public were they made to be compliant suffers the same logical gap as claiming that registration protects the public at all. The only way this reasoning, with its logical gap, has been or could be considered adequate is from the stigma associated with sex offenders. Even the most well-intentioned, serious stakeholders – consciously or unconsciously – often assert less scrutiny towards proponents of laws like SORA and less charity to arguments made against SORA. In other words, sex offender registration laws have widely enjoyed intellectual immunity.

45.     There is no evidence that SORA has ever prevented a sex offense from occurring or otherwise protects the public from suffering sex offenses.  Anyone seeking to establish a rational basis for SORA would need to produce such evidence in order to create a nexus between the legislative intent of SORA and its function.  Asserting a legitimate purpose is only half of the equation.

46.     Even more daunting for Defendant Rausch, he must produce evidence that requiring people, like Mr. Doe, only convicted of non-sexual offenses to register as sex offenders has ever prevented a sex offense from occurring or otherwise protects the public from suffering sex offenses.

47.     The non-sexual offenses under SORA are: false imprisonment, kidnapping, aggravated kidnapping, and especially aggravated kidnapping (the "non-sexual offenses").  These non-sexual offenses are registrable under SORA when the victim is a minor and the offender is not the parent of the victim.

48.     SORA defines "parent" as "any biological parent, adoptive parent or step-parent, and includes any legal or court-appointed guardian or custodian."  Accordingly, a custodian or guardian could be convicted of kidnapping a 13-year-old child and a biological, adoptive, or step-parent could be convicted of kidnapping their own child, even with evidence of sexual motivation, and not have to register as a sex offender.  Yet, Defendant Rausch requires Mr. Doe to register as a sex offender for the rest of his life even though he has never been convicted of sexual misconduct or even accused of it in his supposedly qualifying offense.

49.     Moreover, under SORA, sexual offenders can petition TBI and/or the Davidson Chancery Court for removal after ten years. Tenn. Code. Ann. 40-39-207(a); (g). Those with "violent sexual offender" or "offender against children" classification, however, are required to

comply with the Act for the remainder of their lives. Tenn. Code Ann. § 40-39-207(g)(2)(B). SORA, therefore, perversely provides for the removal of individuals from the registry who have actually been convicted of sexual offenses – albeit those designated either nonviolent or was not committed against a child – while individuals who have never committed a sexual offense of any kind – like Mr. Doe – are required to publicly register as sex offenders for the rest of their lives.

50. SORA enumerates 15 criminal offenses[9] that will result in classification as a "sexual offender" including: sexual battery, statutory rape, sexual exploitation of a minor, false imprisonment of a minor by non-parent, kidnapping of a minor by non-parent, indecent exposure, solicitation of a minor, spousal sexual battery, aggravated statutory rape, soliciting promotion of prostitution, patronizing prostitution, observation without consent, unlawful photographing, aggravated unlawful photography, sexual abuse of a corpse, and any inchoate version of the foregoing. Tenn. Code. Ann. § 40-39-202(20)(A). The essential, statutory elements of all of these registrable offenses expressly require a sexual component or motivation except kidnapping and false imprisonment of a minor by a non-parent.

51. SORA enumerates 19 criminal offenses that will result in classification as a "violent sexual offender" including: aggravated rape, rape, aggravated sexual battery, rape of a child, attempt to commit rape, aggravated sexual exploitation of a minor, especially aggravated sexual exploitation of a minor, aggravated kidnapping of minor by a non-parent, especially aggravated kidnapping of a minor by a non-parent, sexual battery by an authority figure, solicitation of a minor, spousal rape, aggravated spousal rape, statutory rape by an authority figure, incest, aggravated rape of a child, trafficking for a commercial sex act, promotion of prostitution, continuous sexual abuse of a child, and any inchoate or vicarious version of the

---

[9] Some of these registrable offenses include qualifiers like "when the offense is classified as a Class E felony" or "upon a third or subsequent conviction." Tenn. Code. Ann. § 40-39-202(20(A)(xx); (xxii).

foregoing. Tenn. Code. Ann. § 40-39-202(20)(A)(31). The essential, statutory elements of all of these registrable offenses expressly require a sexual component or motivation except aggravated and especially aggravated kidnapping of a minor by a non-parent.

52.     No reasonable person of ordinary intelligence – including Mr. Doe – would expect non-sexual offenses to be considered sexual offenses or violent sexual offenses.

53.     When responding to a previous challenge to SORA regarding the constitutionality of including kidnapping of a minor by a non-parent as a registrable offense, Defendant Rausch identified three "legitimate interest[s]" for doing so, including:

> First, the General Assembly has a legitimate interest in complying with the Jacob Wetterling Act and the Adam Walsh Child Protection Act, which created a nationwide sex offender registry. *Robinson*, 2023 WL 6148550, at *4; *Knox*, 903 N.E.2d at 67-68. Those federal laws incentivized states to make kidnapping and unlawful imprisonment of a minor subject to registration requirements. *Cox*, 2010 WL 3909236, at *5. "Kidnapping and false imprisonment are included as sexual offenses under [Tennessee's Act] because in 2006 Congress enacted the Adam Walsh Child Protection and Safety Act . . . as a replacement for the Jacob Wetterling Crimes [Act]." *Dalton v. State,* No. M2014-02156-CCA-R3-ECN, 2016 WL 2638996, at *6 (Tenn. Crim. App. May 5, 2016) (McMullen, J., concurring). States that fail to require registration for such offenses are "deemed out of compliance with the Act and subject to a ten percent loss in federal funding allocated under the Omnibus Crime Control and Safety Street Act of 1968." Id. Tennessee has a legitimate government interest in complying with the requirements of federal law.
>
> Second, and perhaps more importantly, Tennessee's General Assembly could have adopted the same rationale as Congress for including kidnapping-related offenses in the Act: a legitimate interest in protecting children from sexual abuse. Enactment of the Jacob Wetterling Act was supported by "findings that '[t]wo-thirds of the cases of non-family child abduction reported to police involve sexual assault' and 'child molestation is one of the most underreported crimes.'" Robinson, 2023 WL 6148550, at *4 (quoting Jacob Wetterling Act, Committee on the Judiciary, H.R. Rep. No. 103-392, at 3-4 (1993)). The General Assembly could also "have found that sexual assault occurs in many cases where there is no direct evidence of it," "that, in many cases, the offender intends a sexual assault that is prevented only by the offender's arrest or the escape of the victim," or "that a child cut off from the safety of everyday surroundings is vulnerable to sexual abuse even if the offender's sexual desires are not the motive of the crime." Knox, 903 N.E.2d at 1153-54. The General Assembly could have concluded that the

process of separating out the few child abductors who posed no danger of sexual abuse to children would be "difficult, cumbersome, and prone to error," would impose an "administrative burden," and risked "that some dangerous sex offenders would escape registration." Id. at 1154. In short, "[i]f Congress had a reasonable basis for requiring child abductors to register, it necessarily follows that legislation intended to bring [the state] into compliance with the Jacob Wetterling Act shares that basis." *Cox*, 2010 WL 3909236, at *6.

Third, Tennessee has a legitimate interest in protecting children from child abductors. The General Assembly could rationally conclude that convicted child abductors pose a risk to the safety of children that the Act addresses. Indeed, the General Assembly has stated that "[i]t is a compelling and necessary public interest that the public have information concerning persons convicted of sexual offenses (Footnote: The General Assembly has defined "sexual offense" to include false imprisonment and kidnapping for purposes of the Act, making its clear its statement of intent to have the public protected from child abductors. Tenn. Code Ann. § 40-39-202(20)(A)(v)—(vi)) collected pursuant to this part, to allow members of the public to adequately protect themselves and their children from these persons." Tenn. Code Ann. § 40-39-201(2) (emphasis added). And the General Assembly has declared that one purpose of the Act is "[t]o protect the safety and general welfare of the people of this state." Tenn. Code Ann. § 40-39-201(6). Requiring child abductors to register is rationally related to these explicitly-stated and legitimate government interests.

54.     Defendant Rausch could not and cannot explain how any of these purported interests are rationally furthered by the inclusion on a sex offender registry of people like Mr. Doe who have been convicted of kidnapping without a sexual motivation even being alleged.

55.     Colorado includes second-degree kidnapping as a registrable offense only where the victim is also the victim of a sexual offense.   Colo. Rev. Stat. § 16-22-102(9)(bb) (cross-referencing Colo. Rev. Stat. § 18-3-302(3)(a)).   Nevertheless, Colorado has been deemed a compliant state[10] under SORNA by the Office of Sex Offender Sentencing, Monitoring, Apprehending, Registering, and Tracking[11] ("SMART"):



*Figure 1:  SORNA Implementation Map*

(Source: SMART website)

---

[10] "SORNA Implementation Status", SMART, (available at: https://smart.ojp.gov/sorna/sorna-implementation-status) (last accessed July 4, 2025).

[11] SMART was authorized by SORNA to administer the SORNA standards and grant programs under direction by the Attorney General's Office.

56.     The Judiciary Committee Report previously cited by Defendant Rausch in support of the claim that "'[t]wo-thirds of the cases of non-family child abduction reported to police involve sexual assault' and 'child molestation is one of the most underreported crimes'" (*See* ¶18, 53) relied on a DOJ-commissioned study with heavily skewed methodology.  Some of the author's observations and findings are true.  The sampling of select cases, however, was flawed.  Before covering these flaws, it should be noted that, even if this statistic were correct, Defendant Rausch would be admitting that *one out of every three* people he forces to register as a sex offender for a kidnapping (of a minor by non-parent) conviction did not engage in sexual misconduct.

57.     The study was called "National Incidence Studies of Missing, Abducted, Runaway, and Thrownaway Children in American (NISMART-1).  The Office of Juvenile Justice and Delinquency Prevention ("OJJDP") describes[12] the study as the first in a three-part study as follows:

> The National Incidence Studies of Missing, Abducted, Runaway, and Thrownaway Children (NISMART) 1, 2, 3 were conducted in 1988, 1999, and 2011 in response to language in the Missing Children's Assistance Act that instructed OJJDP "to conduct national incidence studies to determine the actual number of children reported missing each year, the number of children who are victims of abduction by strangers, the number of children who are the victims of parental kidnappings, and the number of children who are recovered each year." The studies provided national estimates of missing children based on surveys of households, juvenile residential facilities, and law enforcement agencies.[13]

---

[12] OJJDP, "National Incidence Studies of Missing, Abducted, Runaway, and Thrownaway Children (NISMART) 1, 2, 3 (abstract)" (available at: https://ojjdp.ojp.gov/research-and-statistics/research-projects/program/national-incidence-studies -missing-abducted-runaway-and-thrownaway-children-nismart-1-2-3-0/overview) (last accessed July 3, 2025).

[13] NISMART was actually the result of Congress's directive to OJJDP to conduct such incidence studies through the Missing Children's Act of 1984.

58.     NISMART-1 consisted of four parts including: a household survey, survey of juvenile facilities, survey of returned runaways, and police records component.[14]

59.     The claim made by the Judiciary Committee Report and Defendant Rausch relies on the Police Records Study portion of NISMART-1.  The Police Records Study ("PSR"), however, was based only on "police files" and not convictions or even prosecutions.  The NISMART-1 authors stated in their Overview of the PSR section:

> The PRS involved a survey of police records and was designed to provide a national estimate of non-family abductions known to law enforcement agencies. **The PRS was developed because it was thought that non-family abduction might occur too rarely for its incidence to be reliably assessed through the principal methodology of the household survey**. At the same time, it seemed that non-family abductions would have a fairly high probability of being reported to law enforcement agencies, so that a survey of the records of these agencies could serve as an efficient alternative method of gathering incidence data on this problem. Episodes of non-family abduction could thus be identified where they would tend to be fairly concentrated and numerous, relative to their dispersed occurrence in the general population.

60.     The household survey portion of NISMART-1 did not even yield enough reports of non-family abductions because the authors "encountered too few actually completed Legal Definition Abductions in [their] interviews with caretakers to permit any estimate of acceptable reliability."[15]   The authors interviewed "10,544 caretakers about the experiences of 20,505 children."   The authors stated, "The Legal Definition Abduction corresponds to the crime of adduction as it is specified in the criminal law of many states and includes the short-term, coercive movement entailed in many rapes and assaults."

---

[14] NACJD, "National Incidence Studies of Missing, Abducted, Runaway, and Thrownaway Children (NISMART), 1988 (ICPSR 9682), (available at: https://www.icpsr.umich.edu/web/NACJD/studies/9682) (last accessed: July 4, 2025).

[15] David Finkelhor, Geral Hotaling, & Andrea Sedlak, Office of Juvenile & Delinquency Prevention, *Missing Abducted, Runaway, and Thrownaway Children in America (1990)*, (available at: https://www.ojp.gov/pdffiles1/ojjdp/nismart90.pdf) (last accessed: July 23, 2025).

61.     NISMART-1 used "police records in 83 law enforcement agencies in a national random sample of 21 counties to find out how many non-family abduction episodes were reported to those agencies."    NISMART-1 then used "exploratory discussions with law enforcement officials, criminologists, and missing children's advocates, as well as one previous police records study of child abduction" to determine that "four general types of crime classifications would contain the most reported cases involving non-family abductions: abduction, missing persons, homicides and sexual assaults."

62.     NISMART-1 estimated between "3,200 and 4,600 Legal Definition Non-Family Abductions known to law enforcement."   The authors explained:

> These figures from the [PSR] are based on two components: a core estimate with a known statistical precision from a 21-county sample and a "multiplier" inferred from the sexual offense files in the four counties where these were examined.  The national survey of 21 counties yielded the core estimate of 1,400 Legal Definition Abductions [...] located in homicide, abduction, and missing person files.  To this we applied a "multiplier" representing the number of additional cases we might have found in sexual assault files had we examined these files in all 21 counties. This multiplier, based on what we found in our four-county substudy, was the ratio of the number of cases in the sexual assault files to the number of cases in the homicide, abduction, and missing person files. The "multiplier" is between 2.3 and 3.3 for Legal Definition Abductions, representing an additional 1,800 to 3,200 cases.
>
> [...]
>
> As explained earlier, the sexual assault multiplier was 2.3 to 3.3, meaning that at least 57 to 70 percent of combined Legal Definition Abduction came from sexual assault files.

63.     According to the methodology described in Paragraph 62, it is no wonder that NISMART-1 – and later, Wetterling Act proponents and, now, Defendant Rausch, in defense of SORA – could reach the conclusion that "two-thirds of reported non-family child abductions involved sexual assault" because the study dramatically oversampled and overrepresented the number of sexual assault files in comparison to abduction files.

64.     Despite "offenses perpetrated by family members" being "outside the scope of [NISMART-1]", the authors still concluded, "Although sexual abuse is one of the most feared components of family abduction, its occurrence was unusual (less than 1%)."

65.     The follow up study, NISMART-2, by two of the three authors of the NISMART-1 study was completed in 2002 and reached a similar conclusion.  As noted by OJJDP in its 2006 National Report, "NISMART-2 researches caution that nonfamily abductions are so rare that 'estimates of the number of caretaker missing and reported missing children abducted by a nonfamily perpetrator are not reliable and have very large confidence intervals.'"  OJJDP continued, "As noted earlier, the stereotypical kidnapping is the type of nonfamily abduction that receives the most public attention; however, these kidnappings account for a tiny proportion of all missing children [...] Most nonfamily child abductions do not include the elements of the extremely alarming kind of crime that comes to mind when we think about kidnapping by strangers."[16]

66.     Moreover, in NISMART-2, the "two-thirds" statistic from NISMART-1 had dropped to "nearly half" of all nonfamily abductions involving a sexual assault.  Although NISMART-2 is not readily accessible like NISMART-1, NISMART-2 has been cited for this finding at least three times including:

- *People v. Johnson*, 870 N.E.2d 415, 425-426 (Ill. 2007);

- Temple University, *New Data on Missing, Runaway Children*, NewsWise (available at: https://www.newswise.com/articles/new-data-on-missing-runaway-children) (last accessed: July 23, 2025); and

---

[16] Snyder, Howard N., and Sickmund, Melissa, 2006, *Juvenile Offenders and Victims: 2006 National Report*, Washington, D.C.: U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention, p. 44 (available at: https://www.ojjdp.gov/ojstatbb/nr2006/downloads/nr2006.pdf) (last accessed July 7, 2025).

- Ofen Raban, "Be They Fish Or Not Fish: The Fishy Registration of Nonsexual Offenders", 16 Wm. & Mary Bill of Rts. J. 497, 523 (2007).

67.    Despite the skewed claim of NISMART-1 and its recitations over the years, NISMART-2 concluded that a non-parent kidnapper of a minor is more likely than not to not be a sex offender.

68.    Accordingly, the central flaw underlying Congress and, subsequently, Defendant Rausch's interpretation of the study is the omission of the fact that non-family abduction cases pale in comparison to the prevalence of family abduction cases, which are *excluded* from the Wetterling Act, SORNA, and SORA as registrable offenses.  Defendant Rausch cannot justify including Mr. Doe on the sex offender registry by relying on a study that confirms Mr. Doe's situation is far more rare than a situation exempted from registration under SORA.[17]

69.    Accordingly, the series of studies relied upon by proponents of SORNA and SORA to justify including kidnapping as a registrable offense actually demonstrate: (1) the vast majority of child abductions are by family members; and (2) the majority of nonfamily child abductions do not involve sexual misconduct.  In other words, the scenario purportedly justifying the inclusion of kidnapping as a registrable offense is a non-preponderate subset (sexual assault) of a "rare" incident (non-family abduction).

---

[17] Ironically, an article introduced by Senator Durenberger into the congressional record during one of his floor discussions in support of the Wetterling Act stated, "Cases like that of Polly Klass – known as 'stereotypical' abductions by strangers – happen about 200 to 300 times a year, according to a Justice Department study [...] They make up a small portion of the more than 100,000 American children abducted each year, ***the vast majority by a family member.***" *See* 140 Cong.    Rec.    S2825    (Mar.    10,    1994)    (available    at: https://www.congress.gov/103/crecb/1994/03/10/GPO-CRECB-1994-pt4-1-2.pdf) (last accessed: July 23, 2025) (emphasis added).

## Background of the Original Criminal Offense

70.     On December 5, 1996, Mr. Doe turned 18 years old.  (*See* Exhibit 2: Doe Affidavit at   5).

71.     Two days later, on December 7, 1996, Mr. Doe and his long-time girlfriend at the time were having an argument as they often did as teenagers.  Mr. Doe drove across town to where his then-girlfriend lived with her grandparents and her brother.  Although the door was locked when he arrived, Mr. Doe's then-girlfriend was yelling at him through the door.  Mr. Doe broke a window on the door, opened the door, and entered the home.  His then-girlfriend and her brother then exited the home with Mr. Doe.  The three had just entered Mr. Doe's vehicle when a Green County Sheriff's Department Officer arrived at the residence.  After the officer spoke to Mr. Doe, Mr. Doe's then-girlfriend, her brother, and her grandmother, the officer arrested Mr. Doe and charged him with Aggravated Kidnapping and Aggravated Burglary.  (*See* Ex. 2: Doe Aff. at   6).

72.     Not only the indictment and judgment but the entire original case file confirms there was never any suspicion or allegation of sexual misconduct or a sexual motivation on the part of Mr. Doe.  (*See* Ex. 2: Doe Aff. at   7).

73.     On May 30, 1997, Mr. Doe entered a Memorandum of Understanding or Information with the State of Tennessee to effectuate three-year suspension of prosecution and pretrial diversion on the amended charges of Kidnapping, Aggravated Criminal Trespass, and Vandalism.  The victims approved this arrangement in writing.  (*See* Ex. 2: Doe Aff. at   8).

74.     On February 6, 1998, Mr. Doe's diversion was terminated by the Court for "lack of amenability to correction" after a failed drug screen.  (*See* Ex. 2: Doe Aff. at   9).

75.     As a result, on April 14, 1998, Mr. Doe was formally indicted by the Greene County Grand Jury on one count of Vandalism, one count of Aggravated Criminal Trespass, and two counts of Kidnapping – one each for his then-girlfriend and her brother.   (*See* Ex. 2: Doe Aff. at   10).

76.     Mr. Doe's indictment does not state the age of either kidnapping victim.  (*See* Exhibit 3: Original Indictment).

77.     On September 4, 1998, Mr. Doe entered a plea agreement to serve three years at 30% and entered a plea of guilty to all four counts in the indictment.  (*See* Exhibit 4: Original Plea Agreement; Exhibit 5: Original Plea Petition; Ex. 2: Doe Aff. at   11).

78.     The Court then entered judgments on all four counts.  (*See* Exhibit 6: Original Judgments; Ex. 2; Doe Aff. at ¶11).

79.     Neither the plea agreement, plea petition nor the judgments include the age of either kidnapping victim. (*See* Ex. 2: Doe Aff. at   12).

80.     No document in the court records of Mr. Doe's original case contains an agreed factual basis or the finding of a factual basis.

81.     The purported age of Mr. Doe's then-girlfriend is found only in three documents in the original case file:  (1) a Grand Jury Report; (2) the original Affidavit of Complaint by the arresting officer; and (3) a TDOC Investigative Report.[18]

82.     The purported age of Mr. Doe's then-girlfriend's brother is found in only one document in the original case file:  the Grand Jury Report.

83.     There is no reference to any kind of sexual component whatsoever in any document in the original case file.  (*See* Ex. 2: Doe Aff. at   13).

---

[18] The fact that neither victim was a child of Mr. Doe was also only evident from the Grand Jury Report, Affidavit of Complaint, and TDOC Investigative Report.

84.     At no point during the case or the resolution of the case did the State of Tennessee or the trial court indicate any interest in Mr. Doe registering as a sex offender.  In fact, the prosecutor expressed on the record during Mr. Doe's plea hearing that his plea agreement did not require him to register as a sex offender.  (*See* Ex. 2: Doe Aff. at   14).

85.     Mr. Doe finished his sentence and was released. (*See* Ex. 2: Doe Aff. at   15).

### *Registration of Mr. Doe*

86.     22 years later, on October 31, 2023, Mr. Doe arrived in Morgan County Correctional Complex to serve an unrelated sentence.  (*See* Ex. 2: Doe Aff. at   16).

87.     Two days later, a prison staff member believed to be Mr. Doe's caseworker informed him that she "spoke with TBI: who instructed her to have Mr. Doe register "because [his] victim was a minor and not his child" referencing his 1998 conviction..  This is the first time Mr. Doe had ever received notice of his need to register as a sex offender. (*See* Ex. 2: Doe Aff. at   17).

88.     Mr. Doe objected and stated, as he reasonably believed, that his 1998 conviction was not a sex offense or sex-related.  The caseworker told Mr. Doe that if he did not sign the requested paperwork, he would be placed in solitary confinement.  Mr. Doe then signed the requested paperwork.  (*See* Ex. 2: Doe Aff. at   18).

89.     A record request to the Tennessee Department of Correction ("TDOC") produced the following record of a November 2, 2023 casefile entry documenting this exchange:



*Figure 2: November 2, 2023 entry into TDOC casefile for Mr. Doe*

(Source: TDOC)

90.     The only source from which "TBI" could have concluded that Mr. Doe's "victim was a minor" was the Grand Jury Report, Affidavit of Complaint, and TDOC Investigative Report because that information was not in his indictment, plea agreement, plea petition, or judgments of conviction.

91.     Whether the victim is a minor and whether the offender is the parent of the victim are material facts under SORA because kidnapping is not a registrable offense *unless* the victim is a minor and the offender is not the parent of the victim.

92.     Because Defendant Rausch's decision to classify and force Mr. Doe to publicly register as a violent sex offender did not turn on Mr. Doe's conviction alone, procedural due process required Mr. Doe to be provided, at minimum, notice and an opportunity to contest these material facts, which were not provided to him.

93.     In Middle District of Tennessee Case Number 3:16-cv-02862, the Plaintiffs alleged in Paragraph 61 on page 25 of their Complaint against the official predecessor of Defendant Rausch that "A registrant's classification is based solely on the offense of conviction. Tenn. Code Ann. § 40-39-202(19), (20), (3), & (31) (2016)." *See Doe v. William Haslem and Mark Gwyn*, 3:16-cv-02862, Doc. No. 1 (M.D. Tenn. Nov. 8, 2016). Defendant Rausch's official predecessor denied that allegation.

94.     In a similar, previous challenge to the constitutionality of Defendant Rausch's classification and forced registration of an individual for a non-sexual offense conviction, Defendant Rausch further admitted the facts in Paragraph 93. *See Doe v. Rausch*, 3:23-cv-00965, D.E. 59,   90 (M.D. Tenn. Oct. 14, 2024).

95.     On March 25, 2025, Governor Lee signed into law an act to amend SORA by adding a new section to Part 2 of Chapter 39 under Title 40 as follows:

> (a) The TBI shall classify a person who is required to register pursuant to this part with a qualifying conviction under § 40-39-202, or who is required to register pursuant to § 40-39-203(a)(2) as a sexual offender, violent sexual offender, or violent juvenile sexual offender, and whether an offender is an offender against children, as defined in § 40-39-202.

> (b) The TBI may rely on investigative reports; files of a United States attorney, district attorney general, or other prosecutorial entity; court records; or other credible information in classifying an offender under this section.

> (c) The TBI shall notify the offender of the classification.

Tenn. Code. Ann. § 40-39-218 (2025).

30

96.     T.C.A. § 40-39-218 was passed through the House under House Bill 582 and through the Senate in Senate Bill 531. On March 4, 2025, Senate Bill sponsor Senator John Stevens told the Senate Judiciary Committee that S.B. 531 "codifies what's been the practice for decades regarding the classification of sex offenders in Tennessee." On February 26, 2025, House Bill sponsor Representative Clay Doggett told the House Judiciary Committee that H.B. 582 was "codifying what is the current practice." Representative Andrew Farmer further stated that, through H.B. 582, "[W]e're basically giving the TBI the authority to do something they've been doing for decades."

97.     On November 3, 2023, a follow up entry for Mr. Doe's case file was made:



*Figure 3: November 3, 2023 entry into TDOC casefile for Mr. Doe.*

(Source: TDOC)

98.     The actual registration documents indicated this caseworker's name was Heather Smiddy.

99.     Record requests to TDOC produced copies of registration – paperwork dated November 3, 2023 with Mr. Doe's initials including: (1) Tennessee Sexual Offender / Violent Sexual Offender Registration / Verification / Tracking Form ("Registration Form"); and  (2) Tennessee Bureau of Investigation Sexual Offender / Violence Sexual Offender / Violent Juvenile Sexual Offender Instructions Form ("Instructions Form").  (*See* Exhibit 7: Registration Form; Exhibit 8: Instructions Form).

100.     The Registration Form has several boxes at the top of the first page of the form that indicate what kind of registration is being completed with the form.  The box for Mr. Doe's 2023 Registration Form is checked as "Information Update" not "Initial Registration".  Prior to November 2023, however, Mr. Doe had never received any paperwork or anything else from the TBI, or otherwise registered as a sex offender.

101.     Far from a waiver of any kind, Mr. Doe's signatures on the Registration Form and Instructions Form were obtained by Defendant Rausch under threat of felony prosecution for failure to register.  Additionally, Mr. Doe was informed by his caseworker, Heather Smiddy, that he would be placed in solitary confinement if he did not sign the Registration Form and the Instructions Form.  This is at least partially corroborated by records obtained from TDOC.

102. The Registration Form reflected Mr. Doe's classification as a "violent" sex offender based on a 1998 conviction for "aggravated kidnapping" of a minor that was not his child.



*Figure 4:  Registration Form excerpt.*

(Source: TDOC)

103. On May 30, 2025, Mr. Doe was released from Morgan County Correctional Complex.  (*See* Ex. 2: Doe Aff. at ¶ 19).

104. On June 4, 2025, Mr. Doe contacted and retained counsel for this action. (*See* Ex. 2: Doe Aff. at ¶ 20).

***Impact of Wrongful Registration***

105.    As an initial matter, Mr. Doe's registration as a "violent sexual offender" is simply inaccurate because he has never been convicted of aggravated kidnapping and his purportedly qualifying offense in 1996 was for kidnapping.  Despite this, Defendant Rausch publicly and wrongfully states the basis for Mr. Doe's registration is a 1996 offense for aggravated kidnapping:

| DATE OF OFFENSE | DESCRIPTION | TCA CODE |
| --- | --- | --- |
| 12/07/1996 | AGGRAVATED KIDNAPPING:VICTIM MINOR, OFFENDER NOT PARENT | 39-13-304 ⑦ |

**39-13-304 AGGRAVATED KIDNAPPING: VICTIM MINOR, OFFENDER NOT PARENT**

(Note: the Sex Offender Law requires the victim to be a minor and the offender to not be the parent of the victim for this crime to be classified as a Violent Sexual Offense.)

(a) Aggravated kidnapping is false imprisonment, as defined in § 39-13-302, committed:

(1) To facilitate the commission of any felony or flight thereafter;

(2) To interfere with the performance of any governmental or political function;

(3) With the intent to inflict serious bodily injury on or to terrorize the victim or another;

(4) Where the victim suffers bodily injury; or

(5) While the defendant is in possession of a deadly weapon or threatens the use of a deadly weapon.

(b)(1) Aggravated kidnapping is a Class B felony.

(2) If the offender voluntarily releases the victim alive or voluntarily provides information leading to the victim's safe release, such actions shall be considered by the court as a mitigating factor at the time of sentencing.

*Figure 5: TSOR profile for Mr. Doe*

(Source: TSOR website)

106.    Despite Mr. Doe's purportedly qualifying offense occurring in 1996 and the conviction occurring in 1998 – many years before SORA was passed in 2004 – Defendant Rausch enforces the current state of SORA retroactively.  Accordingly, Mr. Doe is forced to comply with all the onerous strictures of SORA under threat of felony prosecution, including but not limited to:

- Quarterly in-person reporting to be fingerprinted and photographed;

- Reporting out-of-country travel;

- Not living or working within 1000 feet of a school or other facility for children;

- Being banned from entering, or standing or sitting idly within 1,000 feet of schools, playgrounds or other public facilities if children are believed to be present.

- Reporting certain updates within 48 hours including, but not limited to:

    ○  Primary and secondary residences;
    ○  Employment;
    ○  Intent to relocate to another state;
    ○  Any information on the Registration Form;
    ○  E-mail address;
    ○  Social media profile names;

107.    Since his release from custody in late May 2025, Mr. Doe has interviewed with several employers and even begun training only to lose those employment opportunities upon his disclosure or the employer's discovery of his being on the sex offender registry. (*See* Ex. 2: Doe Aff. at   24).

108.    As a result of Defendant Rausch's violations of Mr. Doe's constitutional rights, Mr. Doe further faces a lifetime of onerous and invasive restrictions and requirements to avoid facing a felony prosecution.  This would still be the case for at least ten years of Mr. Doe's life

even if Defendant Rausch changed Mr. Doe's status from "violent sexual offender" to "sexual offender" to at least comport with SORA, which would do nothing to rectify Mr. Doe's substantive due process, procedural due process, and equal protection rights.

## V.     CLAIMS FOR RELIEF

### COUNT ONE:  SUBSTANTIVE DUE PROCESS

### Fourteenth Amendment Violation - As Applied Challenge

### 42 U.S.C. § 1983

109.    Paragraphs 1 through 108 are incorporated by reference as if fully restated herein.

110.    Substantive Due Process under the Fourteenth Amendment to the United States Constitution protects enumerated rights from government action that is arbitrary, capricious, or shocks the conscience and protects deeply rooted unenumerated rights from the same.

111.    T.C.A. § 40-39-202(31)(H) classifies "aggravated kidnapping where the victim is a minor under § 39-13-304" except when committed by a parent of the minor" as a violent sexual offense requiring lifetime registration as a violent sex offender under T.C.A. § 40-39-207(g)(2)(B).

112.    By enforcing SORA, Defendant Rausch is publicly identifying and forcing Mr. Doe to register as a violent sex offender for the rest of Mr. Doe's life despite Mr. Doe's purportedly qualifying offense not involving even an allegation of sexual misconduct and despite Mr. Doe having never been convicted of sexual misconduct in his life.

113.    Defendant Rausch's arbitrary, irrational, and capricious actions in violation of Mr. Doe's fundamental liberty and freedom shocks the conscience.

114.    Accordingly, this Court should enter an injunction prohibiting Defendant Rausch from enforcing SORA against Mr. Doe on the basis of Mr. Doe's 1998 conviction for kidnapping.

## COUNT TWO:  SUBSTANTIVE DUE PROCESS

### Fourteenth Amendment Violation - Facial Challenge

### 42 U.S.C. § 1983

115.    Paragraphs 1 through 114 are incorporated by reference as if fully restated herein.

116.    False imprisonment, kidnapping, aggravated kidnapping, and especially aggravated kidnapping are non-sexual offenses.

117.    Committing a non-sexual offense against a minor that is not the child of the offender does not change the non-sexual offense into a sexual offense.

118.    It is facially unconstitutionally arbitrary to classify a non-sexual offense as a sexual offense in order to subject such offenders to registration requirements without requiring some proof of sexual misconduct.

119.    There is no set of circumstances where classifying non-sexual offenses as sexual offenses comports with the substantive due process requirements of the Fourteenth Amendment.

120.    Therefore. this Court should enter an injunction prohibiting Defendant Rausch from the facially unconstitutional practice of enforcing SORA on the basis of T.C.A. § 40-39-202(20)(A)(v), T.C.A. §40-39-202(20)(A)(vi), T.C.A. § 40-39-202(20)(B)(x). T.C.A. § 40-39-202(31)(H), or T.C.A. § 40-39-202(31)(I) (the "non-sexual offenses") without requiring proof of a sexual act or motive.

## COUNT THREE:  PROCEDURAL DUE PROCESS

## Fourteenth Amendment Violation - As Applied Challenge

## 42 U.S.C. § 1983

121.    Paragraphs 1 through 120 are incorporated by reference as if fully restarted herein.

122.    Procedural Due Process under the Fourteenth Amendment requires that state action only deprive an individual of a protected interest in life, liberty or property through adequate state process.

123.    Mr. Doe has a liberty interest in not being labeled a sex offender.

124.    Even if Mr. Does does not have a liberty interest in not being labeled a sex offender, his classification as a sex offender obviously causes severe reputational harm.  The resulting registration duties imposed on him by Defendant Rausch altering Mr. Doe's legal status are extensive and onerous.  Mr. Doe has further lost several job opportunities as a direct result of his being on the sex offender registry.

125.    Whether the victim in Mr. Doe's original case was a minor or his child was not included in his judgment of conviction.  Without this information, Defendant Rausch could not have determined whether Mr. Doe's conviction qualified as a registrable offense.

126.    Defendant Rausch has previously admitted that his office routinely relies on information outside the judgment of conviction in making classifications decisions.

127.    Statutory authority for Defendant Rausch to rely on information outside the judgment of conviction did not exist at the time Defendant Rausch classified Mr. Doe as a violent sex offender and used information outside of Mr. Doe's judgment of conviction to do so.

128.     By relying on facts outside Mr. Doe's judgment of conviction to determine sex offender classification without providing Mr. Doe an adequate opportunity and process to challenge those facts, Defendant Rausch injured Mr. Doe's protected liberty interest in violation of his procedural due process rights.

129.     Therefore, this Court should enter an injunction prohibiting Defendant Rausch from enforcing SORA against Mr. Doe on the basis of Mr. Doe's 1998 conviction for kidnapping.

## COUNT FOUR: PROCEDURAL DUE PROCESS

### Fourteenth Amendment Violation - Facial Challenge

### 42 U.S.C. § 1983

130.     Paragraphs 1 through 129 are incorporated by reference as if fully restarted herein.

131.     The newly passed T.C.A. 40-39-218(b) purports to authorize Defendant Rausch to classify offenders like Mr. Doe by unilaterally relying on "investigative reports; [...] prosecutorial [files]; court records; or other credible information" without requiring the information to have been proven beyond a reasonable doubt or agreed to through plea bargaining.

132.     There is no circumstance under which unilaterally substantiating information that is alleged in a criminal process and material to classification does not violate the due process rights of Mr. Doe – and anyone similarly situated – including, but not limited to, the fundamental presumption of innocence.

133.     Accordingly, this Court should enter an injunction prohibiting Defendant Rausch from the facially unconstitutional practice of relying on or otherwise using T.C.A. 40-39-218(b).

## COUNT FIVE: PROCEDURAL DUE PROCESS

## Fourteenth Amendment Violation - Facial Challenge

## 42 U.S.C. § 1983

134.    Paragraphs 1 through 133 are incorporated by reference as if fully restarted herein.

135.    Defendant Rausch has previously admitted that his office routinely relies on information outside of the judgment of conviction in making classification decisions, which it must because there is no such criminal offense in Tennessee as "kidnapping of a minor by a non-parent."

136.    This information has neither been agreed to through plea bargaining nor proven beyond a reasonable doubt or any standard of proof.

137.    Because this information is necessary for Defendant Rasuch to classify offenders under SORA, then it is material information under *Connecticut Department of Public Safety v. Doe*, 538 U.S. 1 (2003).

138.    There is no process under SORA afforded to offenders for challenging Defendant Rausch's use of this unsubstantiated, material information outside of the judgment of conviction or to otherwise challenge one's classification.

139.    Relying on statements from the TBI and sheriffs across the state, multiple lawmakers have characterized this the "practice for decades."

140.    This practice is a violation of the procedural due process rights of Mr. Doe and anyone similarly situated to him.

141.    Accordingly, this Court should enter an injunction prohibiting Defendant Rausch from the facially unconstitutional practice of relying on information outside of the  judgment of

conviction when classifying offenders under SORA without providing a hearing to substantiate or challenge that information.

## COUNT SIX:  EQUAL PROTECTION

### Fourteenth Amendment Violation - As Applied Challenge

### 42 U.S.C. § 1983

142.    Paragraphs 1 through 141 are incorporated by reference as if fully restarted herein.

143.    T.C.A. § 40-39-202(31)(H) classifies "aggravated kidnapping where the victim is a minor under § 39-13-304" except when committed by a parent of the minor" as a violent sexual offense requiring lifetime registration as a violent sex offender under T.C.A. § 40-39-207(g)(2)(B).

144.    Under SORA, therefore, people who are convicted of kidnapping the child of someone else are required to register as sex offenders while people who are convicted of kidnapping their own child are not.

145.    Even a parent who kidnaps their own child *with a sexual motive* is not considered a sex offender under SORA while a person who kidnaps the child of someone else with no sexual motive is considered a sex offender under SORA.

146.    In all relevant respects, Mr. Doe is similarly situated to a parent who is convicted of kidnapping their own child except for the parental status.

147.    Compared to a parent kidnapper, Mr. Doe has been statutorily classified as a sex offender solely on the basis of not being the victim's parent.

148.    Defendant Rausch's disparate treatment of Mr. Doe solely on the basis of parental status is arbitrary and irrational in violation of Mr. Doe's Equal Protection rights.

149. Accordingly, this Court should enter an injunction prohibiting Defendant Rausch from enforcing SORA against Mr. Doe on the basis of Mr. Doe's 1998 conviction for kidnapping.

<h3 align="center">COUNT SEVEN: EQUAL PROTECTION</h3>

<h3 align="center">Fourteenth Amendment Violation - Facial Challenge</h3>

<h3 align="center">42 U.S.C. § 1983</h3>

150. Paragraphs 1 through 149 are incorporated by reference as if fully restarted herein.

151. In addition to the enumerated sex offenses, Defendant Rausch enforces SORA against those convicted of four non-sexual offenses including false imprisonment, kidnapping, aggravated kidnapping, and especially aggravated kidnapping. These non-sexual offenses are only enforced under SORA when the victim is a minor and the offender is not the parent of the minor victim.

152. Defendant Rausch does not enforce SORA against people convicted of these four non-sexual offenses when the victim is not a minor or the victim is the child of the offender.

153. There is no circumstance under which such disparate treatment could be non-arbitrary or rational and comport with the equal protection clause.

154. Therefore, this Court should enter an injunction prohibiting Defendant Rausch from the facially unconstitutional practice of enforcing SORA on the basis of the non-sexual offenses when committed by non-parents but not parents and in cases involving minor victims but not adult victims.

## COUNT EIGHT: PROCEDURAL DUE PROCESS

### Fourteenth Amendment Violation - As Applied Challenge

### 42 U.S.C. § 1983

155. Paragraphs 1 through 154 are incorporated by reference as if fully restarted herein.

156. Mr. Doe has never been convicted of aggravated kidnapping.

157. Defendant Rausch wrongfully classified Mr. Doe as a "violent sex offender" on the basis of a non-existent aggravated kidnapping conviction.

158. Defendant Rausch publicly and incorrectly states that Mr. Doe was convicted of aggravated kidnapping, which subjects Mr. Doe to a lifetime on the sex offender registry.

159. This violates Mr. Does's due process rights including, but not limited to, the fundamental presumption of innocence.

160. Accordingly, this Court should enjoin Defendant Rausch from classifying Mr. Doe as a violent sexual offender based on Mr. Doe's 1998 conviction for kidnapping.

## VII. PRAYER FOR RELIEF

WHEREFORE, all foregoing premises considered, Mr. Doe respectfully requests the following relief:

1. That this Court exercise jurisdiction over Defendant Rausch in his official capacity;

2. That this Court exercise jurisdiction over the subject matter herein;

3. That this Court determine proper venue to be in the Middle District of Tennessee;

4. That this Court empanel a jury under Rule 38 of the Federal Rules of Civil Procedure to decide all issues so triable;

5. That this Court issue a preliminary and permanent injunction as described in Count One, Count Two, Count Three, Count Four, Count Five, Count Six, Count Seven, and Count Eight.

6. That Mr. Doe be awarded his costs, including reasonable attorney's fees pursuant to 42 U.S.C. § 1988;

7. That Mr. Doe be awarded any other relief this Honorable Court finds appropriate.


**Respectfully submitted,**

/s/ Davis F. Griffin
*Davis Fordham Griffin, Esq.*
TBPR #34555
NORTHSTAR LITIGATION, P.C.
209 10th Avenue South, Suite 560
Nashville, TN 37203
T: (615) 866-1156
F: (615) 866-0990
davis@northstarpc.com
*Counsel for Plaintiff*


Submitted: July 29, 2025.